# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3903

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | District of Minnesota. |
| | * | |
| Mohammed Ahmed Kattaria, | * | **[TO BE PUBLISHED]** |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: April 16, 2008
Filed: January 30, 2009

_____

Before LOKEN, Chief Judge, JOHN R. GIBSON, WOLLMAN, MURPHY, BYE, RILEY, MELLOY, SMITH, COLLOTON, GRUENDER, BENTON, and SHEPHERD, Circuit Judges, *en banc*.

_____

PER CURIAM.

A state court search warrant authorized aerial use of a thermal imaging device to detect excess heat emanating from a home owned by Mohammed Kattaria. When the thermal imaging results were consistent with an indoor marijuana grow operation, police obtained and executed three warrants to enter and search homes owned by Kattaria. The searches uncovered 548 marijuana plants, bags of harvested marijuana, and other incriminating evidence. Kattaria was charged in a nine-count superseding

indictment. After the district court[1] denied motions to suppress and for a hearing under Franks v. Delaware, 438 U.S. 154 (1978), Kattaria conditionally pleaded guilty to one conspiracy count charging that he manufactured, distributed, and possessed with intent to distribute fifty or more marijuana plants in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 846.

Kattaria appealed, and a panel of this court affirmed. United States v. Kattaria, 503 F.3d 703 (8th Cir. 2007). Applying the Supreme Court's ruling that investigative thermal imaging of a residence is a "search" for Fourth Amendment purposes, Kyllo v. United States, 533 U.S. 27, 40 (2001), the panel upheld the thermal imaging warrant on alternative grounds: (i) it was supported by a lower quantum of evidence that should be required to establish probable cause to conduct this type of search, and (ii) the thermal imaging warrant and the subsequent warrants to enter and search Kattaria's residences were supported by the quantum of probable cause typically required for criminal investigations. The panel also concluded that the denial of Kattaria's request for a Franks hearing was an issue not preserved for appeal.

Kattaria petitioned for rehearing en banc, arguing that the panel's first reason for upholding the thermal imaging warrant was contrary to Kyllo and a decision of the Ninth Circuit applying Kyllo. See United States v. Huggins, 299 F.3d 1039, 1044 & n.5 (9th Cir.), cert. denied, 537 U.S. 1079 (2002). The government responded that this part of the panel opinion was dicta that need not be reviewed. We granted rehearing en banc and now conclude that all four warrants were supported by traditional probable cause and, alternatively, that the evidence obtained by executing those warrants may not be suppressed under the good-faith exception to the exclusionary rule adopted in United States v. Leon, 468 U.S. 897 (1984). We further conclude that

[1]The HONORABLE DONOVAN W. FRANK, United States District Judge for the District of Minnesota, adopting the Report and Recommendation of the HONORABLE ARTHUR J. BOYLAN, United States Magistrate Judge for the District of Minnesota.

a <u>Franks</u> hearing was properly denied and therefore affirm without considering the panel's alternative ground for upholding the thermal imaging warrant.

## I. Probable Cause for the Warrant Searches.

On May 6, 2004, Special Agent Michael Perry of the Minnesota Bureau of Criminal Apprehension applied to Ramsey County District Court for a warrant to search the residence located at 1814 Malvern Street in Lauderdale, Minnesota. Perry's affidavit stated that the search would be for a single type of "property" -- "An excess amount of heat emitting from the residence and garage relative to comparable structure[s] in the same neighborhood" -- and would be conducted at night in a specified manner:

> Your Affiant[] will utilize the Minnesota State Patrol and their aircraft mounted thermal imagery unit on the residence located at 1814 Malvern Street, and any out buildings to include the garage. . . . Your Affiant will utilize Captain Mark Dunaski of the Minnesota State Patrol, who has been trained and certified by the Drug Enforcement Administration [and] has used thermal imagery equipment for eleven years in the course of his law enforcement duties, including the detection of indoor marijuana growing operations.

In support of the application, Perry averred that in March 2004 a cooperating defendant (CD) reported that Kattaria was an indoor marijuana grower. The affidavit further recited: the CD had known Kattaria for about ten years, occasionally smoked marijuana with Kattaria, and knew Kattaria "has had a lot of trouble with police in the past." The CD had visited the 1814 Malvern residence in 2002, when Kattaria showed the CD an indoor marijuana grow operation in the basement and offered to rent the residence to the CD. The CD identified Kattaria from a driver's license photo. A criminal history check by Perry revealed a 1997 arrest and conviction for possession and sale of marijuana and amphetamine and possession of a firearm, a 2000 arrest for

-3-

sale of marijuana, and a 2003 arrest for fleeing a police officer. The affidavit then set forth the results of Perry's review of utility company records: between November 2003 and April 2004, the residence at 1814 Malvern consumed between 1890 and 2213 kilowatt hours of electricity per month, while neighboring residences of comparable size consumed between 63 and 811 kilowatt hours in the same time period. Perry averred that he had driven past the residence numerous times, observing drawn blinds and no electrical items that would explain the extremely high electric power consumption.

A state district court judge issued a warrant authorizing a nighttime search for a comparatively excessive amount of heat emitting from the residence. The warrant was executed by an aerial search the night of May 7, using a forward looking infrared device. See generally United States v. Olson, 21 F.3d 847, 848 n.3 (8th Cir.), cert. denied, 513 U.S. 888 (1994). Agent Perry then applied to Ramsey County District Court for warrants to conduct physical searches at 1814 Malvern and at a Falcon Heights property also owned by Kattaria. In addition, a Lino Lakes police investigator applied to Anoka County District Court for a warrant to conduct a physical search at a Lino Lakes residence owned by Kattaria, based upon Agent Perry's investigation. In these subsequent applications, Perry averred that Captain Dunaski reported a heat-loss pattern from 1814 Malvern that was unlike neighboring houses, resembled other indoor marijuana grow operations, and suggested a grow operation likely located in the basement, as the CD had reported. The supporting affidavits also set forth the facts contained in Perry's initial affidavit; additional facts tending to confirm the CD's reliability and describing Kattaria's 1997 drug distribution conviction; a comparison of Kattaria's meager wage-earning history with expenses incurred in purchasing multiple residences; and data showing high electric power consumption at the Lino Lakes residence, contrasted with a report from a concerned citizen that no one appeared to have been living at that residence for over two years. Three search warrants issued and were executed, yielding the evidence of substantial marijuana trafficking that Kattaria seeks to suppress.

-4-

On appeal, Kattaria attacks all four warrants, but he focuses on the thermal imaging warrant because the later three warrants were supported by a considerably greater showing of probable cause, including the results of the thermal imaging. He asserts that the district court erred in concluding that the first warrant was supported by probable cause because Perry's affidavit contained no statement as to the CD's reliability, the CD's observation of a grow operation in Kattaria's basement in 2002 was uncorroborated and stale, and the affidavit inaccurately recited that Kattaria's 1997 conviction included possession of a firearm. He argues that the results of this unconstitutional thermal imaging search may not be used to validate the later search warrants. When stale information, inaccurate information, and information from an unreliable informant are removed, he contends, there was no probable cause to support any of the four warrants.

We conclude that the initial thermal imaging search was supported by traditional probable cause, that is, a "fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Whether a search warrant is supported by probable cause is determined by the totality of the circumstances; "resolution of the question by an issuing judge 'should be paid great deference by reviewing courts.'" United States v. Grant, 490 F.3d 627, 631 (8th Cir. 2007), cert. denied, 128 S. Ct. 1704 (2008), quoting Gates, 462 U.S. at 236. The duty of a reviewing court "is to ensure that the issuing judge had a 'substantial basis' for concluding that probable cause existed." United States v. LaMorie, 100 F.3d 547, 552 (8th Cir. 1996), quoting Gates, 462 U.S. at 238-39. We review the district court's fact findings for clear error and the ultimate question whether the Fourth Amendment has been violated *de novo*. United States v. Allen, 297 F.3d 790, 794 (8th Cir. 2002).

In arguing that the state court judge lacked probable cause, Kattaria emphasizes that Agent Perry's first affidavit relied on stale information from a CD whose reliability was not established. Probable cause must exist at the time a warrant issues.

Here, Perry applied for the thermal imaging warrant two months after the CD reported seeing a marijuana grow operation in Kattaria's basement two years earlier. Though quite dated, the CD's information provided the impetus for further investigation. Agent Perry checked Kattaria's criminal history, which corroborated one aspect of the CD's information and revealed that Kattaria had previously been convicted of marijuana trafficking. More significantly, Perry's check of utility records showed recent, abnormally high electric power consumption. Perry's affidavit explained that the indoor cultivation of marijuana requires high heat and humidity and the use of high intensity lights. Thus, the electric power consumption data, coupled with Kattaria's criminal history, provided evidence of continuing criminal activity that compensated for Perry's lack of information about the CD's reliability. See Olson, 21 F.3d at 850. "[W]here recent information corroborates otherwise stale information, probable cause may be found." United States v. Ozar, 50 F.3d 1440, 1446 (8th Cir.), cert. denied, 516 U.S. 871 (1995) (quotation omitted).

Like the district court, we conclude that Agent Perry's supporting affidavit provided the issuing judge a "substantial basis" to conclude that probable cause existed to issue the initial thermal imaging warrant. The affidavits supporting the three later warrants, which included the thermal imaging results from 1814 Malvern and additional facts obtained by Perry's on-going investigation, likewise provided sufficient probable cause to issue warrants authorizing physical searches of three residences owned by Kattaria. Thus, the motion to suppress the fruits of the warrant searches was properly denied.

## II. Denial of a Franks Hearing.

In Franks, the Supreme Court emphasized the presumptive validity of a warrant affidavit but held that:

-6-

where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

438 U.S. at 155-56. In the district court, after the evidentiary hearing on his motion to suppress, Kattaria filed a separate motion for a Franks hearing. Magistrate Judge Boylan issued a Report and Recommendation that the motion to suppress be denied and a separate Order denying the motion for a Franks hearing.

Kattaria filed objections to both rulings, arguing that he was entitled to a Franks hearing because the May 6 thermal imaging warrant affidavit was "misleading" in reciting that Perry checked the electric power consumption records in "late May." The district court overruled that objection and, after Kattaria pleaded guilty, denied his renewed request for a Franks hearing. On appeal, Kattaria's initial brief raised only the issue of the district court's denial of his motion to suppress. Only in his reply brief did Kattaria argue that the district court abused its discretion in denying a Franks hearing, urging a remand for that purpose. The panel declined to consider the issue in part because it was not timely raised on appeal. In responding to the petition for rehearing en banc, the government noted that the panel was "technically correct" but that Kattaria's opening brief had referred to allegedly false or reckless statements in the warrant affidavits. Compare United States v. Head, 340 F.3d 628, 630 n.4 (8th Cir. 2003). As this issue is relevant to the good faith exception under Leon, discussed in Part III, we will exercise our discretion to consider it on the merits. We review the denial of a Franks hearing for abuse of discretion. United States v. Snyder, 511 F.3d 813, 816 (8th Cir.), cert. denied, 128 S. Ct. 2947 (2008).

Kattaria argues that the record establishes two deliberate falsehoods in the warrant affidavits that entitle him to a Franks hearing: first, the affidavits stated that

the CD observed marijuana growing in the basement of 1814 Malvern in 2002, whereas Perry stated that the CD made the visit in 2000 in an informal synopsis of the case he prepared some months later for federal prosecutors; second, Perry admitted at the suppression hearing that the affidavits misrepresented Kattaria's criminal history by stating that his 1997 drug conviction included possession of a firearm.

Regarding the mistaken recitation of a firearm conviction, the government explained that Perry relied on a National Crime Information Center report which inaccurately stated that Kattaria had a prior conviction "for marijuana/poss firearm." Perry's use of that information was not a deliberate or reckless falsehood. "Allegations of negligence or innocent mistake are insufficient." Franks, 438 U.S. at 171. Moreover, whether Kattaria's 1997 marijuana conviction included a firearm offense was immaterial to the probable cause determination.

Regarding when the CD saw marijuana growing in the basement at 1814 Malvern, Perry averred under oath in May 2004 that the CD reported seeing a grow operation in 2002. Many months later, Perry wrote in an informal memo that the CD reported visiting 1814 Malvern in 2000. The district court had ample reason to credit the formal, sworn warrant affidavits prepared shortly after Perry interviewed the CD, rather than an informal memo prepared many months later. More importantly, Kattaria offered no reason to believe that the information in the affidavits was a deliberate or reckless falsehood. Mere allegations of deliberate or reckless falsehoods are insufficient. United States v. Mathison, 157 F.3d 541, 548 (8th Cir. 1998), cert. denied, 525 U.S. 1089 (1999). Finally, even if this information in the affidavits was inaccurate as to timing, the discrepancy is not particularly significant, and the recent November 2003 to April 2004 electric power consumption data still provided the most important evidence of probable cause to issue the thermal imaging warrant. Compare United States v. Timley, 443 F.3d 615, 623-24 (8th Cir.), cert. denied, 549 U.S. 889 (2006). A Franks hearing was properly denied.

### III. Good Faith under <u>Leon</u>

Evidence seized pursuant to a warrant that is later determined to be invalid will *not* be suppressed if the officers executing the warrant acted in good faith reliance on its validity. Suppression is required only if (1) the issuing judge was misled by the affiant's knowing or reckless false statement, a contention we have rejected in Part II, (2) the issuing judge wholly abandoned his judicial role, which is not an issue in this case, (3) the supporting affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or (4) the warrant was "so facially deficient" that the executing officer could not reasonably presume its validity. <u>Leon</u>, 468 U.S. at 923. Issues (3) and (4) turn on "the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the issuing judge's authorization." <u>United States v. Proell</u>, 485 F.3d 427, 430 (8th Cir. 2007) (quotation omitted).

The record demonstrates that Agent Perry and Captain Dunaski relied in good faith on the validity of the thermal imaging warrant. Perry's supporting affidavit was based on information provided by a CD with first hand knowledge of the facts reported. "There is an inherent indicia of reliability in the richness and detail of a first hand observation." <u>United States v. Warford</u>, 439 F.3d 836, 842 (8th Cir. 2006) (quotation omitted). That information was substantially corroborated by Perry's review of Kattaria's criminal history and the electric utility records. Perry's affidavit explained that indoor marijuana cultivation requires "a high heat . . . tropical type environment," meaning that abnormally high electric power consumption was reason to suspect a continuing indoor grow operation. The affidavit further explained, "The cultivation of marijuana requires a well vented location that allows some heat to escape and fresh air to enter. This heat that is vented from the grow location can be detected using thermal imagery." Perry was fully justified in believing that the issuing judge relied on that information in issuing the warrant. <u>Cf.</u> <u>United States v. McCoy</u>, 483 F.3d 862, 864 (8th Cir. 2007).

The three subsequent warrants were supported by affidavits setting forth the results of the thermal imaging, which further corroborated the CD's information, and additional information gathered by Agent Perry's on-going investigation. It is not objectively unreasonable to execute a warrant "where there was evidence to corroborate [an informant's] tip and where an independent magistrate had found that the affidavit stated probable cause." United States v. Koons, 300 F.3d 985, 991 (8th Cir. 2002); see United States v. Tagbering, 985 F.2d 946, 951 (8th Cir. 1993). As the officers executing all four search warrants acted in good faith reliance on their validity, the motion to suppress was properly denied under Leon.

For the foregoing reasons, we affirm the denial of Kattaria's motion to suppress and motion for a Franks hearing. Kattaria also appealed his sentence, arguing it was unreasonable, but he did not petition for rehearing en banc of the panel's adverse resolution of that issue. We vacated the entire panel opinion in granting rehearing en banc. We now affirm the sentence for the reasons stated in the panel opinion. Kattaria, 503 F.3d at 708-09. The judgment of the district court is affirmed.

LOKEN, Chief Judge, with whom JOHN R. GIBSON, Circuit Judge, joins, concurring.

I concur in the court's opinion. I write separately to reaffirm, with one modification, Part I.A of the panel opinion. The panel there concluded "that the same Fourth Amendment reasonable suspicion standard that applies to Terry investigative stops should apply to the issuance of a purely investigative warrant to conduct a limited thermal imaging search from well outside the home." United States v. Kattaria, 503 F.3d 703, 705-07 (8th Cir. 2007). Kattaria's petition for rehearing en banc asserted that this conclusion conflicts with the Supreme Court's decision in Kyllo v. United States, 533 U.S. 27 (2001), because in requiring a warrant to conduct aerial thermal imaging of a home, Kyllo implicitly adopted the fixed standard of probable cause that applies in criminal investigations -- a "fair probability that

contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). The court declines to address this issue.

The Fourth Amendment explicitly provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The issue is whether the probable cause required to obtain a warrant may ever vary based on the nature of the property being searched, the purpose of the search, and the extent of the physical intrusion into the home that the search will entail. This is an important issue of constitutional law. See, e.g., Albert W. Alschuler, Bright Line Fever and the Fourth Amendment, 45 U. Pitt. L. Rev. 227, 243-56 (1984); Joseph D. Grano, Probable Cause and Common Sense: A Reply to the Critics of Illinois v. Gates, 17 U. Mich. J.L. Reform 465, 501-06 (1984). The Supreme Court has spoken inconsistently on the issue in various contexts. In this context, I think it is properly viewed as an open issue.

Viewing the issue historically supports the panel's position. The architects of the Fourth Amendment intended to prohibit general warrants and writs of assistance that had been used, in England, to punish political dissenters and, in the colonies, to collect unpopular taxes.[2] See Marshall v. Barlow's, Inc., 436 U.S. 307, 311-12

---

[2]Two leading English cases were Wilkes v. Wood, 98 Eng. Rep. 489 (C.P. 1763), and Entick v. Carrington, 95 Eng. Rep. 807 (K.B. 1765), trespass actions attacking the Crown's use of general warrants to combat seditious libel. The courts held the warrants invalid for lack of oath or affirmation and particularized cause for suspicion without discussing the level of cause required to justify a warrant search. See Jacob W. Landynski, Search and Seizure and the Supreme Court 28-30 (1966). The writ of assistance was valid for the life of the sovereign and allowed a constable to seize "prohibited or uncustomed goods" by breaking and entering houses, shops, and other buildings. In a well publicized 1761 case, James Otis attacked a writ for permitting "Custom house officers [to] enter our houses when they please . . . bare suspicion without oath is sufficient . . . ." Again, the quantum of cause that should be

(1978). Like the leading common-law authority on search and seizure, they used the term probable cause to reflect the need for particularized suspicion to justify a search or seizure.[3] "The issue was whether any evidentiary basis would be required to authorize searches and seizures, not what quantum of evidence would be necessary." Alschuler, supra, at 254.

Early Supreme Court cases likewise construed the term "probable cause" in two 1799 statutes as meaning reasonable cause or suspicion. See Locke v. United States, 11 U.S. (7 Cranch) 339, 348 (1813) (Marshall, C.J.) ("'probable cause,' according to its usual acceptation . . . . imports a seizure made under circumstances which warrant suspicion."); Stacey v. Emery 97 U.S. 642, 646 (1878) ("If there was a reasonable cause of seizure, there was a probable cause. In many of [the] reported cases the two expressions are used as meaning the same thing."). More recent decisions are not to the contrary. See, e.g., Maryland v. Pringle, 540 U.S. 366, 371 (2003) ("the substance of all the definitions of probable cause is a reasonable ground for belief of guilt . . . particularized with respect to the person to be searched or seized") (quotations omitted); Ornelas v. United States, 517 U.S. 690, 696 (1996) (probable cause and reasonable suspicion are "fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed").

In Kyllo, overruling a majority of the circuit courts that had considered the issue, the Court held that the Fourth Amendment requires police investigators to obtain a warrant to conduct an aerial thermal imaging search of a private residence.

---

required was not addressed. See Telford Taylor, Two Studies in Constitutional Interpretation 24-41 (1969).

[3]Noted seventeenth-century jurist Matthew Hale "used the terms 'suspicion,' 'probable cause of suspicion,' and 'reasonable cause of suspicion' interchangeably," demanding only a judicial finding of "some basis for suspecting a particular individual." Grano, supra note 1, at 480-81; see Landynski, supra note 1, at 27 n.34; Alschuler, supra, at 253.

-12-

But the Court did not discuss what showing of probable cause is constitutionally required to obtain this warrant. When I contrast Kyllo with the Court's decision in Camara v. Municipal Court, 387 U.S. 523 (1967), I infer that its silence on this issue was both intentional and significant.

In Camara, the Court overruled Frank v. Maryland, 359 U.S. 360 (1959), and held that the Fourth Amendment requires a warrant to enter a home for the purpose of inspecting for violations of municipal fire, health, and housing codes. But concluding that a warrant was required, the Court explained, "must be the beginning, not the end, of our inquiry." 387 U.S. at 534. The Court discussed at length how the Fourth Amendment's probable cause standard should be applied in this context. Explaining that this standard can take into account the nature of the search that is being sought, the Court concluded there is "probable cause" to issue a warrant for area-wide inspections of homes "if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling." Id. at 538 (quotation omitted). This probable cause holding was followed in See v. City of Seattle, 387 U.S. 541 (1967), and in Marshall, 436 U.S. at 320-21, though there were strong dissents in each of these cases.

At the same time, other decisions relaxed the traditional probable cause standard in limited contexts where the Court concluded that a warrant was not necessary and that the "special needs" of government, balanced against the nature of the privacy interests affected by the particular search or seizure, made a different standard reasonable under the circumstances. See New Jersey v. T.L.O., 469 U.S. 325, 340-41 (1985); id. at 351 (Blackmun, J., concurring). For example, Terry v. Ohio, 392 U.S. 1 (1968), and Adams v. Williams, 407 U.S. 143 (1972), held that the police may make brief and minimally intrusive investigative stops if they have reasonable suspicion that criminal activity may be afoot. Despite broad pronouncements that reasonableness is the overarching Fourth Amendment principle,

however, the Court has not applied the reasonable suspicion standard to criminal investigations that require a warrant, particularly for searches of the home.

In this environment, it is not surprising that the Court has characterized Camara -- which specifically required warrants issued under a modified probable cause standard -- as an exception to traditional probable cause that is limited to "administrative search warrants." Griffin v. Wisconsin, 483 U.S. 868, 877-78 (1987); see City of Indianapolis v. Edmond, 531 U.S. 32, 37-38 and 54 (Rehnquist, C.J., dissenting) (2000); O'Connor v. Ortega, 480 U.S. 709, 723 (1987). The distinction may be convenient, but it is analytically inadequate. As the Court recognized in Camara, a building inspector's non-consensual entry and search for violations of a myriad of health and safety codes breaks "the sanctity of the home," and most housing codes "are enforced by criminal processes." 387 U.S. at 530-31. Recall that, for the Framers, use of writs of assistance to collect odious taxes was as much the problem addressed by the Fourth Amendment as use of general warrants to crush political dissent through criminal prosecutions. The Court in Camara required a warrant for this type of regulatory search to increase, not to relax, Fourth Amendment protections. The judicial warrant "provides the detached scrutiny of a neutral magistrate" and "assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." United States v. Chadwick, 433 U.S. 1, 9 (1977), citing Camara, 387 U.S. at 532.

Griffin held only that, under the Wisconsin regime at issue, probation authorities did not need a warrant or probable cause to search a probationer's home. 483 U.S. at 875-76; accord United States v. Knights, 534 U.S. 112, 121-22 (2001). But in rejecting the dissenters' contention that a judicial warrant should be required, the Court observed, "The Constitution prescribes . . . that where the matter is of such a nature as to require a judicial warrant, it is also of such a nature as to require probable cause. Although we have arguably come to permit an exception to that prescription for administrative search warrants . . . we have never done so for

-14-

constitutionally mandated judicial warrants." Id. at 877-78. Though Griffin was a five-to-four decision, this statement is widely viewed as deciding, more broadly than the quoted passage requires, that probable cause to obtain a judicial warrant is a uniform, rigorous standard in all contexts. Perhaps so. That would explain the broad statement in Kyllo -- another five-to-four decision -- that "The Fourth Amendment's protection of the home has never been tied to measurements of the quality or quantity of information obtained." 533 U.S. at 37. But that statement was made in a paragraph rebutting an entirely different argument by the government -- that no warrant should be needed for a search that does not reveal "intimate details."

I cannot predict how the Supreme Court would decide this difficult issue. But given the conflicting signals in the historical record and in the Court's recent decisions, I do not read Griffin and Kyllo as categorically holding that the probable cause required to obtain a warrant for criminal investigative purposes can never be "context dependent," that is, affected by the nature of the property to be searched, the manner of search, and the intrusiveness the search will entail. Certainly, there are strong reasons for applying a "single, familiar standard . . . to guide police officers." Dunaway v. New York, 442 U.S. 200, 213-14 (1979). But in my view, this case illustrates the problem with adopting that rigid approach.

Special Agent Perry wished to conduct thermal imaging as part of his investigation of the suspected indoor growing of marijuana. He applied for a warrant for that specific purpose, as Kyllo required. When the thermal imaging results confirmed the likely presence of an indoor grow operation, Perry applied for three warrants to conduct far more intrusive physical searches of Kattaria's properties, submitting supporting affidavits that included the thermal imaging results from 1814 Malvern plus additional facts from his on-going investigation. This was a constitutionally reasonable investigative sequence. The initial thermal imaging was far less intrusive than a physical search of the residence, and it provided important corroboration that criminal activity was likely being conducted before the homeowner

-15-

or other resident was subjected to a full physical search.  See, e.g., United States v. Pinson, 24 F.3d 1056, 1057 (8th Cir.), cert. denied, 513 U.S. 1057 (1994) (suspicious thermal imaging results support showing of probable cause to conduct subsequent physical search).  If the same quantum of evidence is required to obtain both kinds of warrants, law enforcement may have little incentive to incur the expense of a minimally intrusive thermal imaging search before conducting a highly intrusive physical search.  Thus, from the perspectives of both effective law enforcement and the privacy rights of the homeowner, there is good reason to adjust the focus of the probable cause inquiry when law enforcement officials seek a warrant *solely for the purpose of conducting investigative exterior thermal imaging*.

On further reflection, I have concluded that the panel was unwise to borrow the concept of "reasonable suspicion" to reflect the quantum of probable cause that should be required in this situation.  Reasonable suspicion is not focused to the task at hand, and it has never been applied to the warrant-issuing process.  Rather, the question for the issuing magistrate (and reviewing courts) when considering an application like Agent Perry's initial warrant affidavit should be whether there is probable cause to believe that search of specific property -- the heat being emitted from a home -- in a specific manner -- by exterior thermal imaging -- for purely investigative purposes will uncover evidence[4] of on-going criminal activity.  Utility records showing abnormally high electric power usage are strong evidence supporting such an application but, without more, are unlikely to establish probable cause because of the many innocent uses of electricity.  Cf. United States v. Olson, 21 F.3d 847, 850 (8th

---

[4]It may be worth noting that, prior to the decision in Warden v. Hayden, 387 U.S. 294, 307 (1967), a warrant could not be issued to search for "mere evidence." See generally Taylor, supra note 1, at 50-64.  When the Court subsequently upheld a warrant to search a newspaper's files for evidence identifying violent demonstrators, Justice Stevens in dissent blamed the "novel problem" of warrants to seize papers from innocent third parties on Hayden's "profound change in Fourth Amendment law." Zurcher v. Stanford Daily, 436 U.S. 547, 577 (1978).

Cir.), cert. denied, 513 U.S. 888 (1994). But the "something more" should simply be enough particularized suspicion to justify the minimal intrusion caused by the exterior thermal imaging of heat emissions, without regard to whether there is probable cause to issue a warrant to conduct a full physical search. Here, Agent Perry's initial affidavit clearly meets that standard.

Following the Supreme Court's decision in Kyllo, a panel of the Ninth Circuit concluded without extensive analysis that "the quantum of probable cause necessary to justify a thermal imaging search does not differ from that necessary to justify a physical search." United States v. Huggins, 299 F.3d 1039, 1044 n.5 (9th cir.), cert. denied, 537 U.S. 1079 (2002). If correct, that means judges will apply the flexible standard of Gates -- a "fair probability that contraband or evidence of a crime will be found in a particular place," 462 U.S. at 238 -- with "great deference" to the issuing judge's resolution of that issue, and with "close calls" resulting in no suppression of evidence if the police conduct meets the good faith standards of United States v. Leon, 468 U.S. 897 (1984), as the courts decided in Huggins and in United States v. Jarrell, 68 F. App'x 622, 625-27 (6th Cir.), cert. denied, 540 U.S. 1005 (2003). Our court takes that approach here and reaches, in my view, the correct result. But I think the vital interests protected by the Fourth Amendment would be better served by a more focused probable cause standard.

_____