*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1802**

State of Minnesota,
Appellant,

vs.

Albert Hester, III,
Respondent.

**Filed April 27, 2015
Reversed and remanded
Schellhas, Judge**

Crow Wing County District Court
File No. 18-CR-14-3039

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Donald F. Ryan, Crow Wing County Attorney, David F. Hermerding, Assistant County Attorney, Brainerd, Minnesota (for appellant)

Dennis M. Lothspeich, Dennis M. Lothspeich, PA, Brainerd, Minnesota (for respondent)

Considered and decided by Stauber, Presiding Judge; Schellhas, Judge; and Hooten, Judge.

**U N P U B L I S H E D   O P I N I O N**

**SCHELLHAS**, Judge

Appellant challenges the district court's suppression of evidence obtained during execution of a search warrant at respondent's home and dismissal of the complaint against respondent. We reverse and remand.

**FACTS**

On July 30, 2014, Lakes Area Drug Investigating Division (LADID) Narcotics Investigator Troy Nash applied for a warrant to search the home of respondent Albert Hester III for controlled substances and evidence of their sale. Investigator Nash prepared the supporting affidavit, which described information from three informants implicating Hester in the sale of methamphetamine out of his home. A district court judge reviewed the warrant application, concluded that probable cause existed for the issuance of a warrant, and issued a warrant to search Hester's home. During execution of the search warrant the next day, police found 16.8 grams of methamphetamine, 8 firearms, a digital scale with methamphetamine residue on it, drug paraphernalia, numerous prescription and nonprescription drugs, and $14,853 in U.S. currency.

Appellant State of Minnesota charged Hester with first-degree controlled-substance crime (sale of ten or more grams of methamphetamine) and second-degree controlled-substance crime (possession of six or more grams of methamphetamine). Applying the totality-of-the-circumstances test and concluding that the search-warrant application was not supported by sufficient probable cause, the district court granted Hester's suppression motion and dismissed the complaint. This appeal follows.

**D E C I S I O N**

"In order for an appellate court to review a pretrial order, the State must show that the district court's ruling will have a critical impact on its case." *State v. Obeta*, 796 N.W.2d 282, 286 (Minn. 2011). Hester concedes that the district court's suppression-and-dismissal order had a critical impact on the state's case against him.

"Before searching a residence, police usually must obtain a valid warrant issued by a neutral and detached magistrate." *State v. Yarbrough*, 841 N.W.2d 619, 622 (Minn. 2014), *as amended on denial of reh'g* (Mar. 6, 2014). A valid search warrant must be supported by probable cause. U.S. Const. amend. IV; Minn. Const. art. I, § 10. "The issuing judge's task is to make a practical, common-sense decision" whether "the evidence sought likely exists" and whether "there is a fair probability that the evidence will be found at the specific site to be searched." *Yarbrough*, 841 N.W.2d at 622; *see also U.S. v. O'Dell*, 766 F.3d 870, 873–74 (8th Cir. 2014) (stating that "[t]he existence of probable cause depends on whether, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place" and that "[t]he issuing judge should review the affidavit with a common sense approach and not in a hypertechnical fashion" (quotations omitted)).

"When reviewing a decision to issue a search warrant, [appellate] review is limited to whether the judge issuing the warrant had a substantial basis for concluding that probable cause existed." *Yarbrough*, 841 N.W.2d at 622 (quotation omitted). In answering this question, "[appellate courts] are to consider the totality of the circumstances and must be careful not to review each component of the affidavit in isolation." *State v. Jenkins*, 782 N.W.2d 211, 223 (Minn. 2010) (quotation omitted). "[T]he resolution of doubtful or marginal cases should be largely determined by the preference to be accorded to warrants." *State v. Gail*, 713 N.W.2d 851, 858 (Minn. 2006) (quotations omitted); *see also Massachusetts v. Upton*, 466 U.S. 727, 734, 104 S. Ct. 2085, 2089 (1984) (stating that "[a]lthough in a particular case it may not be easy to

3

determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants" (quotation omitted)).

"[Appellate courts] look only to information presented in the affidavit in making th[e] determination" whether a warranted search was supported by probable cause. *Gail*, 713 N.W.2d at 858 (quotation omitted). In this case, a description of the following information from three informants—R.J., S.M., and an unnamed cooperating defendant (CD)—dominated Investigator Nash's affidavit in support of the application for a warrant to search Hester's home.

Narcotics Investigators Nash and Travis Loeffler interviewed R.J. on April 30, 2014, while R.J. was in custody for a controlled-substance crime. R.J. stated that (1) on or about April 25 or 26, 2014, she and a named individual visited "Al's" house at a specified address; (2) during that visit, after waiting "in line" behind "a lot" of people who were purchasing methamphetamine, R.J. and the named individual purchased a softball-sized quantity of methamphetamine from "Al"; and (3) on April 29, 2014, R.J. and the named individual were on their way to "Al's" house to purchase more methamphetamine when they were arrested for possession of a controlled substance. Investigator Nash showed R.J. a driver's license photo of Hester, and R.J. identified the man in the photo as "Al."

Narcotics Investigator Joe Sundgaard interviewed S.M. on an unspecified date, while S.M. was in custody on outstanding warrants. S.M. stated that (1) "Al Hester" is the main supplier of methamphetamine in the Crosby, Minnesota, area; (2) Hester's

4

supplier of methamphetamine is a white male, approximately 40 years old, from Fargo, North Dakota; (3) Hester's supplier delivers every week on Monday or Friday between 3:00 and 5:00 a.m.; (4) Hester's supplier meets with Hester near his garage and the transactions are done inside a 2006 or 2007 black Chevrolet pickup with a hidden compartment in the driver's side door, which compartment may be opened by pulling and turning the door handle; (5) Hester keeps the methamphetamine in a locked case in his bedroom, which case generally sits next to a gun case with four locks but sometimes is kept on a television stand or dresser; (6) Hester has a Mac-10, an AK-47, numerous hunting rifles, a 9 mm handgun, and a .38 caliber that he acquired from a named individual; (7) a Tec-9 submachine gun hangs in a special mount beside Hester's bed; (8) Hester sells an ounce of methamphetamine for $1,100; (9) an ounce of methamphetamine, when sold in smaller quantities, nets a profit of $2,800; (10) S.M. used to sell methamphetamine for Hester; (11) S.M. had received from Hester a minimum of one ounce and a maximum of five ounces of methamphetamine; and (12) S.M. frequents Hester's home. On June 13, 2014, Investigator Sundgaard advised Investigator Nash of S.M.'s statement.

Investigator Nash interviewed the CD on July 30, 2014. The CD stated that (1) late at night "about three days" before the interview, the CD observed approximately two pounds of methamphetamine on a table or workbench in Hester's garage; (2) at that time, Hester provided the CD with one ounce of methamphetamine; (3) the CD has been inside Hester's home; (4) Hester keeps quantities of methamphetamine in his bedroom; (5) the CD has purchased between 1 and 1.75 grams of methamphetamine from Hester on

approximately 10 to 15 separate occasions; (6) Hester's home is a white house with a white, detached garage; (7) Hester has surveillance cameras outside his home to monitor visitors; (8) Hester is aware that the CD is uncomfortable around firearms and has never possessed any firearms around the CD; (9) numerous pocketknives may be found throughout Hester's home; (10) numerous individuals "sometimes frequent" Hester's home and are known to carry firearms; and (11) a named individual "has been seen recently" at Hester's home.

In concluding that Investigator Nash's search-warrant application was not supported by sufficient probable cause, the district court reasoned that "[S.M.]'s information raises the question of staleness," "the factors weighing against credibility outweigh the factors in favor of credibility," and "the lack of current, independent, corroborating information at the time of the Application undermines a finding of probable cause." On appeal, the state asserts that the search warrant was supported by sufficient probable cause, arguing that the statements provided by R.J., S.M., and the CD were consistent and corroborated one another and that the district court "erred by taking a hypertechnical view of the application, and by not according the issuing [judge] the appropriate deference."

*Staleness*

"[T]he freshness of the [inculpatory] information . . . is an important factor for determining the probability that contraband or evidence of a crime will be found in a particular place," *State v. Carter*, 697 N.W.2d 199, 206 (Minn. 2005) (quotation omitted), because a search-warrant affidavit must include evidence of "facts so closely related to

6

the time of the issue of the warrant as to justify a finding of probable cause at that time," *State v. Souto*, 578 N.W.2d 744, 750 (Minn. 1998) (quotation omitted). Yet, as we have noted,

> [c]ourts have refused to set arbitrary time limits or to establish a rigid formula in making the determination of whether the probable cause underlying a search warrant has grown stale. Instead, the question must be determined by the circumstances of each case. The approach should be one of flexibility and common sense.

*State v. King*, 690 N.W.2d 397, 401 (Minn. App. 2005) (quotations and citations omitted), *review denied* (Minn. Mar. 29, 2005); *see also U.S. v. Darr*, 661 F.3d 375, 378 (8th Cir. 2011) (stating that "staleness is a case-specific inquiry, and probable cause cannot be judged by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit" (quotation omitted)). "Relevant circumstances include the character of the crime, the character of the criminal, the character of the thing to be seized, and the character of the place to be searched." *King*, 690 N.W.2d at 401 (citing *State v. Yaritz*, 287 N.W.2d 13, 16 (Minn. 1979)).

"When an activity is of an ongoing, protracted nature, the passage of time is less significant." *Souto*, 578 N.W.2d at 750; *see also U.S. v. Morrison*, 594 F.3d 626, 631 (8th Cir. 2010) (stating that "[w]here continuing criminal activity is suspected, the passage of time is less significant" (quotations omitted)). Drug-related activity may have an ongoing, protracted nature that extends the freshness of information regarding that activity. *See U.S. v. Carnahan*, 684 F.3d 732, 736 (8th Cir. 2012) (stating that "in investigations of ongoing narcotics operations, intervals of weeks or months between the

7

last described act and the application for a warrant does not necessarily make the information stale" (quotation omitted)). And where an affidavit contains both recent information and consistent, older information, the information in its entirety may be sufficiently fresh. *See State v. Hochstein*, 623 N.W.2d 617, 623 (Minn. App. 2001) (rejecting staleness argument because, inter alia, "certain information provided by the third informant was only three days old when the court signed the warrant"); *see also U.S. v. Palega*, 556 F.3d 709, 715 (8th Cir. 2009) (reasoning that "[w]hile some of the information provided in the warrant affidavit was more than two years old, there was also information as recent as five days prior to the warrant application," and concluding that "when taken as a whole, the information is not stale"); *U.S. v. Maxim*, 55 F.3d 394, 397 (8th Cir. 1995) (stating that "information about criminal activity at an earlier, unspecified time may combine with factually connected, recent, time-specific information to provide a substantial basis for the conclusion that the criminal activity described in an affidavit is sufficiently close in time to the search warrant application" (quotation omitted)).

Here, although Investigator Nash's affidavit shows that S.M. must have learned the information no later than June 13, 2014—about six weeks before Investigator Nash applied for the search warrant—Hester is correct that the affidavit does not state when S.M. learned the information that he later revealed to Investigator Sundgaard. Hester argues that S.M.'s information therefore "must be disregarded as stale." He also asserts that R.J.'s three-month-old information is "arguably stale." By so arguing, Hester urges us to evaluate independently the freshness of the information from each informant. But appellate courts "must be careful not to review each component of the affidavit in

isolation." *Jenkins*, 782 N.W.2d at 223 (quotation omitted); *see also Upton*, 466 U.S. at 732, 104 S. Ct. at 2088 (concluding that reviewing court erred by "insist[ing] on judging bits and pieces of information in isolation"). Accordingly, we consider S.M.'s undated information together with R.J.'s three-month-old information and the CD's three-day-old information.

Hester claims that "the informants were not consistent with one another in the information they provided." But the only "inconsistencies" identified by Hester are that (1) S.M. stated that Hester keeps methamphetamine in a locked case in his bedroom, while the CD reported that methamphetamine was located on a table or workbench in Hester's garage; and (2) S.M. reported that Hester has many firearms, while the CD stated that Hester has never possessed firearms around the CD. Yet the CD also stated that Hester keeps methamphetamine in his bedroom, notwithstanding the single reported instance in which the CD saw methamphetamine in Hester's garage. And the CD stated that Hester is aware that the CD is uncomfortable around firearms—an awareness that may have led Hester to conceal his firearms during the CD's visits.

Even if minor inconsistencies exist among separate pieces of information in Investigator Nash's affidavit, the information is basically consistent when considered as a whole. All three informants implicated Hester in the sale of methamphetamine out of his home. Both R.J. and S.M. implicated Hester in the sale of methamphetamine to many people. And both S.M. and the CD mentioned Hester's garage in connection with the distribution of methamphetamine, stated that Hester keeps methamphetamine in his

9

bedroom, and discussed Hester's distribution of one-ounce quantities of methamphetamine.

Furthermore, Investigator Nash's affidavit describes Hester's ongoing, rather than episodic, sale of methamphetamine. The affidavit relays S.M.'s statement that Hester "is the main supplier in the Crosby area for methamphetamine." The affidavit also states that (1) in April 2007, an individual was arrested with approximately seven grams of methamphetamine that the individual claimed Hester provided; (2) "LADID received another report that Hester was still selling a lot of methamphetamine to individuals in the Crosby and Grand Rapids area" in March 2008; and (3) "for almost ten years," Investigator Nash and other LADID investigators "have received numerous reports . . . naming Hester as a major supplier in the Crow Wing County area."[1] And the affidavit contains information that Hester distributed methamphetamine as recently as three days, according to the CD—*and* as long ago as three months, according to R.J.—before the date of the search-warrant application.

When properly viewed as an undissected whole, the information contained in Investigator Nash's affidavit was sufficiently fresh to show a "fair probability" that controlled substances and evidence of their sale would be found at Hester's home as of the date of the search warrant. *See Yarbrough*, 841 N.W.2d at 622.

---

[1] We do not consider Investigator Nash's assertion that "it is apparent that Hester is always in possession of controlled substances." *See Souto*, 578 N.W.2d at 749 (declining to consider affiant's "statement that 'he [knew]' that [defendant] was involved in the possession and/or distribution of drugs on a wide scale" because statement "was too vague and conclusory to bolster the state's position that [defendant] was a drug dealer" (first alteration in original)).

10

*Reliability*

Whether information from an informant is sufficient to establish probable cause "depends on the totality of the circumstances of the particular case, including the credibility and veracity of the informant." *State v. Munson*, 594 N.W.2d 128, 136 (Minn. 1999); *see also State v. Olson*, 436 N.W.2d 92, 95 (Minn. 1989) (stating that "[i]n evaluating an informant's tip, [an appellate] court looks at the commonsense totality of the circumstances, including the informant's veracity, reliability, and basis of knowledge" (citing *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332 (1983))), *aff'd*, 495 U.S. 91, 110 S. Ct. 1684 (1990). "Although 'an informant's veracity, reliability and basis of knowledge are all highly relevant' in determining whether probable cause exists when an affidavit is based on hearsay information, they are not 'entirely separate and independent requirements to be rigidly exacted in every case.'" *U.S. v. Stevens*, 530 F.3d 714, 718 (8th Cir. 2008) (quoting *Gates*, 462 U.S. at 230, 103 S. Ct. at 2328 (internal quotations omitted in original)).

"Recent personal observation of incriminating conduct has traditionally been the preferred basis for an informant's knowledge." *State v. Wiley*, 366 N.W.2d 265, 269 (Minn. 1985); *see also U.S. v. Kattaria*, 553 F.3d 1171, 1178 (8th Cir. 2009) (stating that "[t]here is an inherent indicia of reliability in the richness and detail of a first hand observation" (quotation omitted)). An informant is more reliable if she makes in-person statements against her own interest; the informant's reliability also is enhanced by any corroboration of her information. *See Souto*, 578 N.W.2d at 750–51 (concluding that an "informant's reliability was satisfactorily established" where the informant met with

police "face-to-face and made admissions against his own interest" and where "information provided by the informant was corroborated by [police]"); *State v. McCloskey*, 453 N.W.2d 700, 704 (Minn. 1990) (stating that "[t]he mere fact that the statement was in some way against the informant's interest is of some minimal relevance in a totality-of-the-circumstances analysis of probable cause," that "the fact the informant came forward and met with [police] rather than completely hiding behind the cloak of telephonic anonymity . . . is significant," and that even "minimal corroboration is at least another relevant factor on which the magistrate was entitled to rely in making the totality-of-circumstances assessment of probable cause"); *Wiley*, 366 N.W.2d at 269 (reasoning that corroboration of peripheral details from an informant's statement "did lend credence to the informant's tip"); *see also O'Dell*, 766 F.3d at 874 (stating that "[i]f information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable"); *U.S. v. Buchanan*, 574 F.3d 554, 562 (8th Cir. 2009) (stating that "[t]he circumstances of personal questioning may . . . enhance reliability and credibility"); *U.S. v. McAtee*, 481 F.3d 1099, 1103 (8th Cir. 2007) (noting that informant made "statements against her own penal interest, which lends credibility to her statements").

Here, in a face-to-face police interview, each of the informants made a statement against penal interest by confessing to the purchase and/or sale of methamphetamine. Hester acknowledges that such statements "can weigh in favor of credibility." But a question remains as to corroboration. The district court, citing *Hochstein*, 623 N.W.2d at

12

623, reasoned that information provided by one informant cannot corroborate information provided by another informant unless the information is also corroborated by independent police investigation. Because Investigator Nash's affidavit did not recount any such corroboration through independent police investigation, the court concluded that "th[e corroboration] factor weighs strongly against reliability." Hester embraces the court's conclusion, arguing that "[u]nreliable information must be corroborated by reliable independent investigation and not other unreliable tips."

But *Hochstein* does not dictate the district court's conclusion. In that case, as in this case, three informants implicated the defendant in the sale of methamphetamine, and the defendant challenged the informants' reliability. *See Hochstein*, 623 N.W.2d at 622–23. We rejected that challenge as follows:

> [T]he affidavit establishes that the informants' statements, taken as a whole, show sufficient reliability and basis of knowledge. Although there is no showing of how the first of the three informants learned that [defendant] was selling methamphetamine, *this informant's statement corroborates, and is corroborated by, the statements of the other two informants.* . . . [T]he police confirmed the second informant's statement that [defendant] has a motor home. The affidavit established the personal-knowledge basis of the second informant's statement: he/she had been to [defendant]'s home . . . and observed methamphetamine in the home.
>
> . . . [T]he third informant also referred to the later-corroborated fact that [defendant] has a motor home. This informant's information was based on personal knowledge after visiting [defendant]'s home[.] . . . Furthermore, the affiant police officer states that, based on his own investigation, he discovered that [defendant] has no legal source of income.

13

*Id.* at 623 (emphasis added) (citation omitted). Although "the informants' statements . . . were corroborated by statements of other informants *and* by the officer's independent investigation," we did not state that independent police investigation was necessary to our conclusion in *Hochstein*—much less required to show corroboration in every case. *See id.* (emphasis added).

Indeed, such a rigid requirement would be inconsistent with the totality-of-the-circumstances approach to the probable-cause inquiry. *See Wiley*, 366 N.W.2d at 268 ("In reviewing the sufficiency of an affidavit under the totality of the circumstances test, courts must be careful not to review each component of the affidavit in isolation. Even if each component is judged unsubstantial, the components viewed together may reveal . . . 'an internal coherence that [gives] weight to the whole.'" (alteration in original) (quoting *Upton*, 466 U.S. at 734, 104 S. Ct. at 2089)). One informant's information may be corroborated by another informant's consistent information. *See Hochstein*, 623 N.W.2d at 623 (stating that one "informant's statement corroborates, and is corroborated by, the statements of the other two informants"); *see also Buchanan*, 574 F.3d at 562 (stating that "[p]robable cause can be established when information from one informant is consistent with that of a second, independent informant"); *U.S. v. Leppert*, 408 F.3d 1039, 1041 (8th Cir. 2005) (rejecting defendant's argument "that the police, rather than another informant, must corroborate the statements of an untested informant" by noting that "[the Eighth Circuit] ha[s] said that information provided by one informant may be corroborated with specific, consistent details provided by a second informant, and that, in fact, the tips of

two informants may be reciprocally corroborative, rendering their information enough to support a finding of probable cause" (quotations omitted)).

Here, the information in Investigator Nash's affidavit is largely specific and basically consistent when considered as a whole. And while the affidavit does not show the basis of much of S.M.'s knowledge, the affidavit does indicate that R.J.'s and the CD's knowledge was based on personal observation of incriminating conduct. *See Wiley*, 366 N.W.2d at 269. In this case, as in *Hochstein*, "the informants' statements, taken as a whole, show sufficient reliability and basis of knowledge." *See* 623 N.W.2d at 623.

In sum, neither staleness nor unreliability undermines the issuing judge's conclusion that Investigator Nash's affidavit provided probable cause to search Hester's home for controlled substances and evidence of their sale. While "[n]o single piece of evidence in [the affidavit] is conclusive[,] . . . the pieces fit neatly together and, so viewed, support the . . . determination that there was a fair probability that contraband or evidence of a crime would be found," *see Upton*, 466 U.S. at 733, 104 S. Ct. at 2088 (quotation omitted), particularly in light of the "great deference [owed] to the issuing judge's determination of probable cause for a search warrant," *see State v. Bourke*, 718 N.W.2d 922, 927 (Minn. 2006) (quotation omitted). The issuing judge had a substantial basis for concluding that probable cause existed for the search, and the district court erred in concluding otherwise.

**Reversed and remanded.**

15