

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-76,105

### ERICK DANIEL DAVILA, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL FROM CAUSE NO. 1108359D
### IN CRIMINAL DISTRICT COURT NUMBER ONE
### TARRANT COUNTY

COCHRAN, J., delivered the opinion of the unanimous Court.

### O P I N I O N

Appellant was convicted of capital murder for shooting a five-year-old child and her grandmother during the same transaction.[1] Based upon the jury's answers to the special punishment issues, the trial court sentenced appellant to death. On direct appeal to this Court, appellant raises fourteen points of error, including the sufficiency of the evidence to support his conviction. After reviewing all of his points of error, we find them to be without

---

[1] TEX. PENAL CODE § 19.03(a)(7)(A).

merit.  Therefore, we affirm the trial court's judgment and sentence of death.

**Factual Background**

On April 6, 2008, eleven-year-old Cashmonae Stevenson, along with numerous friends and relatives, celebrated her sister Nahtica's ninth birthday at a "Hannah Montana" birthday party at her grandmother's home in the Village Creek Townhouses in Fort Worth.[2] Except for Cashmonae's uncle, Jerry Stevenson, all of the guests were women and children. About 8:00 p.m., just as the fifteen children were eating ice cream and cake on the front porch, Cashmonae saw a black Mazda slowly drive by.  Inside was a man holding a gun with "a red dot" on it.  Cashmonae "felt in her stomach" that something bad was going to happen because "no one ever rolled by with a gun pointed towards our house."  Her uncle Jerry said, "The fool has a K in the car."[3]  And then Cashmonae heard her grandmother, Annette Stevenson, say, "They trying to find trouble."

A few minutes later Cashmonae saw a man run across the field, stand next to the house in front of theirs, and start shooting with "the red dot" pointed at their porch.[4]  He kept shooting at them as the children and adults "stacked up on top of each other" as they tried to

---

[2] This neighborhood was known for gang-related violence, frequently between the Bloods, who used red as their "color,"and the Crips, who used blue.

[3] Jerry later testified that he thought the rifle was an AK-47; in fact, it was an SKS.  The two rifles are similar in appearance and function.

[4] Jerry Stevenson testified that he saw the gunman, dressed all in black, shooting at them, so he grabbed his son's hand, pulled him into the house, and threw him into a corner to protect him as he saw his mother stagger through the door and walk toward her bedroom.  When Jerry saw that his daughter, Queshawn, was not inside, he ran to the door, and saw her lying on the front porch.  He ran out, picked her up, and carried her back inside.

run through the front door.  They were all screaming and trying to get to safe places inside.

Cashmonae saw her uncle, Jerry Stevenson, lay his five-year-old daughter, Queshawn, down on the sofa.  She was bleeding and looked dizzy.  According to Jerry, "her guts was hanging out."  After the gunshots ended, Cashmonae discovered that she had been shot in the elbow, the hand, and the shoulder.  Nahtica and another little girl, Brianna, as well as Sheila Moblin, one of the adults at the party, had also been shot.  Cashmonae's grandmother, Annette, had been killed, as had five-year-old Queshawn.

Meanwhile, just a couple of blocks away, Kent Reed was attending a different birthday party at his mother-in-law's home on Luther Court.  While he was barbecuing, Kent saw a black car with customized vents pull up and stop.  A man with distinctive-looking ears[5] and slashes in his eyebrows got out on the driver's side.  It was appellant.[6]  He was wearing a hoodie, black jeans, a baseball cap turned backwards, and red and black tennis shoes.  Appellant was carrying a big gun with a red beam shining from it onto the ground.  He knocked on the next-door neighbor's door, but no one answered, so he walked down a trail between the buildings toward the field.  The passenger in the black car slid over into the driver's seat and sped off.

A few minutes later, Kent heard a series of distinctive shots, a pause, and then several

---

[5] Appellant had a very large diamond-looking earring as well as a large silver bolt in his earlobe.

[6] Kent's wife, Arlette, also saw the black car and knew it was a Mazda.  She saw appellant and could identify him by the distinctive earrings in his ears.

more shots.  He gave a written statement to the police that evening in which he described the car and the man that he had seen. The next day, Kent picked appellant out of a photo line-up.

Fifteen-year-old Eghosa, along with several of his friends, was at the same party with Kent.  He noticed the man with a long rifle and a red-dot beam and, sensing something peculiar,[7] he and two friends followed the man as he walked between the buildings.  Eghosa saw the man walk through the field, stand next to an air conditioning unit beside one building, and then take aim on the house across the street.  He saw the man train the red beam from the rifle on Jerry Stevenson[8] ("Big Boy Dooney"), but when "Dooney" went inside, he moved the beam to the windows of the house.   Eghosa saw "Granny"–Annette Stevenson–and the kids playing on the Stevenson's porch.  Once "Dooney" went inside, the man started firing the gun.  He trained the red beam on "Granny" who tried to shoo the children inside.  Then Eghosa saw "Granny" get shot a couple of times; he could see the bullets hitting her as she fell in the doorway.  The man shot about nine times while he was standing at the corner,  then he ran to the middle of the street and shot several more times. The same car that Eghosa had seen the shooter get out of on Luther Court came around the

---

[7] The rest of the party-goers were also apprehensive at the sight of this silent man in black toting a big rifle with an infrared scope.  They went inside the home on Luther Court.

[8] Jerry Stevenson testified that, about a week before the murders, he had intervened in what may have been a gang-related quarrel in front of his mother's home between some Bloods and his nephew, Gary, who was visiting.  Jerry agreed that the apartment complex was known as Blood territory, but that his mother's house might have been identified as "a Crip house," even though no one at her home actually was a Crip member.  One of appellant's fellow gang members testified that Jerry or "Dooney" was "never no threat" to the Bloods, so nobody had ever bothered him or his family members.

corner and stopped.  The shooter jumped into the driver's seat and then sped off.  Eghosa said that the man appeared frustrated when he failed to hit "Dooney," and he lowered the rifle, but then raised it again and started firing once more.[9]

By the time the first police officer arrived, it was a chaotic scene.  There was a dead woman–Annette Stevenson–in the back bedroom, a seriously injured child–Queshawn–on the couch in the living room, two more children with leg wounds in the dining room, blood splattered everywhere, and both adults and children screaming and trying to help or console the wounded and each other.  Crime scene officers found four shell casings beside the air conditioning unit across the street and four more scattered in the street where the second series of shots had been fired.  They photographed the bullet holes found all along the porch walls and in the windows of the Stevenson home.

Nichcole Blackwell testified that she and appellant were living together in April of 2008.  She said that appellant had a "Truman Street Bloods" tattoo on his chest and he liked to wear the color red.  He had a black rifle, but Nichcole told him to take it away because she didn't like guns.  On Sunday, April 6th, appellant drove off in Nichcole's black Mazda 626 at about 3:00 p.m.  He was wearing a black shirt and either red or black pants. He returned about 8:00 or 9:00 p.m., left again, returning around 11:00 p.m., and then left once more around midnight and finally returned around 4:00 a.m. and went to sleep.  The next day Nichcole learned that her car might have been involved in the murders, so she called the

---

[9] Numerous other witnesses from the neighborhood also heard and saw the shooting and described appellant's actions as did Eghosa.

police who asked her to come down and give them a statement.

Based upon the police investigation, Detective Brent Johnson obtained a warrant for appellant's arrest shortly after midnight on April 8th. That afternoon, appellant was arrested and, over the course of seven hours, gave four written statements to the police. In his third statement,[10] appellant said that he and his friend Garfield were driving around in Nichcole's black Mazda when he decided that

> we can have a shoot em up. I told [Garfield] I was gonna drive to the back and to let me out of the car and for him to leave. I had the AK with me, but I didn't have the clip, so I had to go to Ms. Sheilas to get the clip. We went around to the back of the apartments and the AK has a scope and a red beam on it. I went up to Ms. Sheilas door carrying the AK. A little boy answered the door and I went in and got the clip that was right under the sofa. I got the clip and put it in the AK. When I went back outside I went through the field where the shooting happened. Ms. Sheilas house is kind of like a trap. That is where everybody goes to keep their guns and their weed.
>      . . . When I told Garfield it was my hood and we were going to have a shoot em up, and I was going to scare them and let them know that I had a gun. . . . I had a scope on my gun, so I had range. I stood in the field across the street. The fat dude was in the middle of the street. The other 3 were on the porch. I wasn't going to give them a chance to get a gun. Garfield had stopped my car in the middle of Anderson and I thought they were going to start shoot up my car. I only let off ten rounds and I had 21 in the clip. I was trying to get the guys on the porch and I was trying to get the fat dude. I wasn't aiming at the kids or the woman and don't know where the woman came from. I don't know the fat dudes name, but I know what he looks like, so I recognized his face.[11]

Appellant also explained that he had given his SKS semi-automatic rifle to "Terminal," a

---

[10] Appellant's fourth statement dealt with an extraneous murder, evidence of which was admitted during the punishment phase of trial.

[11] This excerpt is taken verbatim from appellant's written statement without change of syntax, spelling, or punctuation.

fellow Bloods gang member, the day after the murders.  Terminal later led police to appellant's rifle, which had been covered in a dark shirt and left in a wooded area.  The SKS had a folding stock, an infrared scope, and a bayonet affixed to it.

## Sufficiency of the Evidence

In his first and second points of error, appellant claims that the evidence is legally and factually insufficient[12] to support his conviction for intentionally or knowingly causing the death of two people.  He argues that he intended to kill only Jerry Stevenson and therefore his intent to kill Jerry cannot be transferred to the deaths of both Annette and Queshawn.

Under Texas law, "[a] person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that . . . a different person or property was injured, harmed, or otherwise affected."[13]  This concept is known as the doctrine of transferred intent.  The issue of transferred intent is raised when the evidence shows that a defendant intends to harm one person but actually harms a different person instead.[14]  The rationale for the rule is

---

[12] After appellant had filed his Brief in this case, we overruled the *Clewis* line of cases regarding factual sufficiency in *Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010).  We held that the sole standard for measuring evidentiary sufficiency of the evidence is that set out by the Supreme Court in *Jackson v. Virginia,* 443 U.S. 307 (1979).

[13] T EX. PENAL CODE § 6.04(b)(2).

[14] *See Manrique v. State*, 994 S.W.2d 640, 647 (Tex. Crim. App. 1999) (McCormick, P.J., concurring); *Pettigrew v. State*, 999 S.W.2d 810, 812-13 (Tex. App.–Tyler 1999, no pet.) (affirming murder conviction of defendant who shot at a rival gang resulting in an innocent bystander being shot by a member of that rival gang); *see also Dowden v. State,* 758 S.W.2d 264, 272-73 (Tex. Crim. App. 1988) (sufficient evidence supported capital-murder conviction where defendant initiated shoot-out in police station that resulted in friendly-fire death of different

straightforward: murder requires the killing of another human being, but not of a particular human being.[15]   The defendant wanted to kill one or more human beings; the fact that he did not manage to kill the very same persons that he intended to kill, does not exculpate him or diminish his criminal responsibility.

Appellant argues that the evidence shows that he intended to kill only one person, thus his one criminal intent can be transferred to only one of the victims, not both.  In his Brief, appellant relies primarily upon our reasoning in a non-death-penalty capital-murder decision, *Roberts v. State*.[16]   That case, however, is both factually and legally distinguishable from the present one.  In *Roberts,* the evidence showed that the defendant intentionally or knowingly shot and killed Virginia Ramirez.  He also caused the death of Ms. Ramirez's eight-to-nine-week-old fetus.  The court of appeals had held that the defendant's intent to cause the death of Ms. Ramirez could also transfer over to the death of her unborn fetus.[17]   This Court reversed the defendant's capital-murder conviction for intentionally killing two people.[18]   Although there was ample evidence in the record that the defendant intended to cause Ms. Ramirez's death, there was no evidence that the defendant also intended to cause the death

officer).

[15] *See generally*, Michael Bohlander, *Transferred Malice and Transferred Defenses: A Critique of the Traditional Doctrine and Arguments for a Change in Paradigm*, 13 NEW CRIM. L. R. 555, 556 (2010).

[16] 273 S.W.3d 322 (Tex. Crim. App. 2008).

[17] *Id.* at 326-27.

[18] *Id.* at 327.

of her fetus because there was no evidence that he (or anyone else) knew that Ms. Ramirez was pregnant at the time of the murder.  We explained,

> Transferred intent may be used as to a second death to support a charge of capital murder that alleges the deaths of more than one individual during the same criminal transaction only if there is proof of intent to kill the same number of persons who actually died, *e.g.*, with intent to kill both Joe and Bob, the defendant killed Joe and Lou.  It may also be used if, intending to kill both Joe and Bob, and being a bad shot, the defendant killed Mary and Jane.[19]

That latter scenario is precisely what happened in this case.  The evidence shows that appellant intended to kill possible members of the Crips gang, but he mistakenly killed a grandmother and small child instead.  As appellant himself explained, he went to "a shoot em up" in which he intended to kill "the fat dude in the middle of the street" and the three "guys on the porch."  That is, he intended to shoot four males, not two females.  But, under Texas law, the intent to kill four males will transfer to the unintentional killing of two females.[20]  There is ample evidence in the record to support the jury's verdict that appellant intended to cause more than one death in his "shoot em up" attack.  That evidence includes

---

[19] *Id.* at 331.

[20] *Id.*; *see, e.g., Pettigrew*, 999 S.W.2d at 812-13; *Grayson v. State*, No. 14-04-00226-CR, 2005 WL 1669537 *1-3 (Tex. App.– Houston [14th Dist.] July 14, 2005, pet. ref'd) (not designated for publication) (evidence sufficient to support murder conviction during neighborhood "gun battle" confrontation under transferred intent even though no witness actually saw defendant shoot victim); *Lawrence v. State*, No. 09-03-215-CR, 2005 WL 550705 *1-2 (Tex. App.–Beaumont March 9, 2005, pet. stricken) (not designated for publication) (murder conviction upheld; evidence sufficient under doctrine of transferred intent when evidence showed defendant intended to shoot Thomas, but hit Price instead); *Castillo v. State*, No. 07-00-0365-CR, 2001 WL 1044895 *1-2 (Tex. App.–Amarillo 2001, no pet.) (not designated for publication) (evidence sufficient to support defendant's "drive-by" murder conviction under transferred intent when evidence showed that he shot at pedestrian who had shouted at him, but hit and killed another person instead).

the following:

(1)     Appellant gave a written statement explaining that he intended to "get the fat dude" and who he mistakenly thought were three guys on the porch;[21]

(2)     Cashmonae testified (as did other witnesses) that appellant aimed the "red dot" at "different parts of the house" and at different persons;

(3)     Appellant used a high-powered SKS semi-automatic rifle with an infrared beam to fire between ten to fifteen bullets into the group of women and children on Ms. Stevenson's front porch;

(4)     Appellant fired a burst of bullets from one location across the street, then paused as he ran to the middle of the street and fired a second burst of bullets;

(5)     Eghosa said that appellant looked "frustrated" after the first burst of fire when Jerry or "Dooney" had escaped into the house, so appellant moved and then fired a second burst at the remaining women and children;

(6)     Appellant used a rifle with an infra-red scope that would give him greater precision in shooting at what he intended to hit;

(7)     His semi-automatic SKS required him to pull the trigger each time he intended to shoot; thus he intended to shoot his targets at least ten to fifteen different times;

(8)     Expert testimony that appellant's choice of bullets, high-powered hollow-point bullets, was consistent with a shooter who wants to cause maximum damage or death to his intended target.

Viewed in the light most favorable to the verdict under the appropriate *Jackson*

---

[21] Although appellant claims, in a separate point of error, that his confession should not have been admitted, in reviewing the sufficiency of evidence, we consider both properly and improperly admitted evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (in conducting legal sufficiency review, courts assess "all of the evidence," including evidence that was improperly admitted).

standard,[22] we conclude that the evidence is sufficient to support the jury's verdict that appellant intended to (or knew that he was reasonably certain to) cause two deaths when he repeatedly shot his SKS semi-automatic rifle at the birthday party group on Ms. Stevenson's front porch.  Appellant's first and second points of error are overruled.

## The Validity of the Arrest Warrant

In his third, fourth, fifth, and sixth points of error, appellant contends that the trial court erred in denying his motion to suppress his four written statements because these statements were "the fruit" of an arrest warrant that was based upon false information within the affidavit.  He claims that, if the false information were deleted from that affidavit, the remaining, accurate information was insufficient to establish probable cause to arrest him.

Appellant relies on *Franks v. Delaware*,[23] for the proposition that only information that the affiant believes is truthful and accurate may be considered in establishing probable cause for a warrant.[24]  In *Franks,* the Supreme Court recognized that, if an affirmative

---

[22] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (judging sufficiency of evidence to support conviction by assessing "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."); *see Dowden v. State*, 758 S.W.2d 264, 272-73 (Tex. Crim. App. 1988) (evidence sufficient to support capital-murder conviction of police officer under doctrine of transferred intent when defendant initiated a "shoot-out" at police station).

[23] 438 U.S. 154 (1978).

[24] In *Franks*, the Supreme Court stated,
[W]here the defendant makes a substantial preliminary showing that a false statement knowingly or intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause the Fourth Amendment requires that a hearing be held at the defendant's request.  In the event that at that hearing the

misrepresentation is knowingly or recklessly included in a probable cause affidavit in support

of a search warrant and that misrepresentation is necessary to establish probable cause, the

warrant is rendered invalid under the Fourth Amendment.[25] But an officer's mere negligence

or innocent mistakes are insufficient to invalidate the warrant.[26]

The trial judge at a suppression hearing, even one involving a *Franks* claim, is the sole

trier of fact and the judge of the credibility of the witnesses and the weight to be given the

evidence.[27] Appellant claims that there is a conflict or inconsistency between two statements

purportedly made by April Coffield to Detective Johnson in the arrest-warrant affidavit and

in a recorded interview that the detective conducted with Ms. Coffield the day after the

murders. The pertinent portion of the affidavit, with the disputed portions underlined, states

the following:

> April Coffield was near the party at 5758 Luther Ct., visiting a cousin.

---

allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.
438 U.S. at 155-56.

[25] *Id.* Appellant also invokes article I, § 9 of the Texas Constitution, and notes that an analysis under state constitutional law must be separate and distinct from its federal counterpart. But he provides no separate and distinct analysis of the Texas Constitution as a basis for his federal constitutional claim under *Franks*. Therefore, we decline to address any potential distinction between appellant's claim under the federal and Texas constitutions.

[26] 438 U.S. at 171.

[27] *Hinojosa v. State*, 4 S.W.3d 240, 247 (Tex. Crim. App. 1999); *Janecka v. State*, 937 S.W.2d 456, 462 (Tex. Crim. App. 1996).

I interviewed Coffield. Coffield saw what she believed to be a green Ford Focus drop a black man off in the 5700 block of Luther Ct. Coffield saw the man run toward the four bedroom town home at the corner of Anderson. Coffield saw a red dot on the ground while the man was running.
. . .
Coffield stated that she heard shots fired as did Charlene Ogierumwense. Coffield ran into house and then peeked out. Coffield saw the man, who got out of the car on Luther Ct., standing in front of the apartment where the children's birthday party was in progress. He was holding a rifle. Coffield then saw the man fire into the apartment. The man fled on foot. Ken Reid[28] saw the car that dropped off the man speed away from the scene. A man came out of the apartment at 5701 Anderson. The man was "hollering." Coffield recognized that there was trouble. Coffield went into the apartment in an attempt to help. In the apartment, Coffield saw people who appeared to have been shot. . . .

Detective F. Serra III 2167 prepared photospreads containing Davila and five other black males of similar physical characteristics. Detective Boetcher and I showed the photospreads to witnesses. Ken Reid immediately picked Davila as the man he saw carrying the rifle from Luther Ct. Reid told me that he saw Davila's face under a street light. April Coffield looked at the photospread. She seemed nervous at first. She put her finger on Davila and said she saw him once. Detective Boetcher asked her about Davila. Coffield admitted to Detective Boetcher that she has seen Davila at least a dozen times. Coffield then said that Davila was the man she saw running with a rifle and that Davila was the man she saw shoot into the apartment where Queshawn and Annette Stevenson were killed.

Appellant asserted that, during the April 7th recorded interview, Ms. Coffield did not make the specific statements that are underlined in the affidavit. During the pretrial hearing, Detective Johnson explained that Ms. Coffield had, at first, denied seeing appellant's face,[29]

---

[28] At trial, the witness explained that his name is Kent Reed.

[29] In fact, during the recorded interview, Coffield said, at one point, that she never saw the shooter's face on the night in question. But the single most distinctive aspect of appellant's appearance are the remarkably large shiny earrings he wore and the large silver-colored bolts through his ear. These earrings and bolts are prominently obvious in appellant's photograph that

but then she gave a complete description of his weight, height, skin color, hair style, and she identified his photograph in the line-up.

The transcript of the recorded interview shows that she told Detective Johnson that she saw a person standing across the street from the Stevenson's house and shooting at the house. Then she identified appellant as the shooter in the subsequent photo line-up. Furthermore, at the time that Ms. Coffield made the photo identification, she gave the detective additional details about appellant that were not part of the initial recorded interview. And the affidavit reflects these added statements were made at the time that she made the photo identification, not at the time of the recorded interview.

Although Ms. Coffield said that she did not see the rifle as the shooter walked through the field, she did tell the detective that she had seen a "red beam" following him, and other witnesses had already described the semi-automatic rifle with the "red dot." Appellant also claims that Ms. Coffield never said that she "peeked" out of the house that she ran into after hearing the initial shots. Indeed, she never used the word "peek" during the initial interview, but she did say that, after the first burst of gunfire, she ran inside her cousin's house, and then, when she thought the shooting "was over and done with–I started going toward the [Stevenson's] house and then seen him standing at the house and he started shooting again."

In sum, Detective Johnson explained the perceived inconsistencies and discrepancies between the details Ms. Coffield gave him during their initial interview and those that she

both Kent Reed and Ms. Coffield identified as being the shooter. Appellant may be identified more by his ears than his face.

made at the second interview when she identified appellant's photograph.  There is no evidence that Detective Johnson knowingly, intentionally, or with reckless disregard for the truth, made false or misleading assertions in his affidavit.  The trial judge could reasonably believe that any inconsistencies were the result of negligence or innocent mistake by Detective Johnson.  Furthermore, these discrepancies are minor and not material to the existence of probable cause set out in the affidavit.  The trial judge did not abuse her discretion in denying appellant's motion because he had not proven, by a preponderance of the evidence, that Detective Johnson inserted false or misleading information in his affidavit.[30]

Finally, several days after the evidentiary hearing, the trial judge stated an alternative basis for her original ruling denying appellant's motion to suppress.  She found that, even if all of Ms. Coffield's statements were omitted from the affidavit, the magistrate still had probable cause to issue the arrest warrant.  She explained, "I know the State didn't specifically argue if you excise it, it's still sufficient, but that was the analysis I went through."  We agree.  Even if all of the information supplied by April Coffield is excised from the affidavit, the remaining information suffices to establish probable cause to believe that appellant was the person who shot and killed Annette Stevenson and her granddaughter.

---

[30] *See Franks*, 438 U.S. at 156; *United States v. Kattaria,* 553 F.3d 1171, 1177 (8th Cir.) (en banc) (per curiam) ("We review the denial of a *Franks* hearing for abuse of discretion."), *cert. denied,* 558 U.S.__ (2009).

This alternate finding also satisfies *Franks*.[31] We overrule appellant's third, fourth, fifth, and sixth points of error.

## The Voluntariness of Appellant's Written Statements

In his seventh, eighth, ninth, and tenth points of error, appellant claims that the trial judge erred in overruling his motion to suppress his four written statements stemming from custodial interrogation.   He argues that his statements were involuntarily made because he did not eat, drink, or go to the bathroom for almost seven hours during his interview with Detective Johnson.  He argues that he was deprived of these basic needs and therefore any statements he made were unconstitutionally coerced.[32] He states, "Though Detective Johnson testified that Appellant made no specific requests for anything, Appellant contends that it [is] ridiculous to believe that anybody would be in a position to give four voluntary written statements without receiving some food or water and without needing to use the restroom."

Detective Johnson testified that appellant was arrested and brought to the police station at about 1:40 p.m. on April 8th.  Detectives Johnson and Boetcher met with him in an interview room where appellant's handcuffs were removed and he was placed in leg cuffs.

---

[31] *See Franks*, 438 U.S. at 155-56 (if purportedly false statements are set aside, the remainder of the affidavit must be insufficient to establish probable cause before the warrant may be held invalid); *Ramsey v. State*, 579 S.W.2d 920, 922-23 (Tex. Crim. App. 1979) (before warrant may be held invalid, defendant must "[s]how that when the portion of the affidavit alleged to be false is excised from the affidavit, the remaining content is insufficient to support issuance of the warrant.").

[32] Appellant relies upon the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Article I, § 10 of the Texas Constitution, and Article 38.22 of the Texas Code of Criminal Procedure.

He began the interview by asking appellant if he wanted "anything to eat or drink or anything like that. He said no. I do it that way every time. And then I advised him of his *Miranda* rights." Appellant told Detective Johnson that he understood his rights and that "he freely, intelligently and voluntarily waive[d] those rights" and agreed to talk with the officers. "He was very relaxed. Just sat there kind of casual." Appellant gave his first statement beginning at 4:00 p.m. and ended it at 4:25. He gave the second statement beginning at 6:47 p.m. and completed it at 7:22. The officers began taking the third statement at 7:38 p.m. and concluded it at 8:12.[33] Detective Johnson said that he did not do anything to deny appellant his basic needs, did not prevent him from having liquids or food, and did not prevent him from going to the restroom. He took a picture of appellant lounging casually in his chair in the interview room. Appellant does not appear to be under any stress or duress.

On cross-examination, Detective Johnson again said that appellant appeared very relaxed; "[t]he whole thing was extremely friendly." Appellant "never asked to go to the bathroom"; he never asked for fluids or food. Detective Johnson reiterated that he had offered, but appellant turned him down.

Detective Boetcher also testified and said that appellant gave his fourth statement beginning at 8:45 p.m. and completed it at 9:06. He said that appellant had used the

---

[33] This third statement is the one in which appellant admitted his guilt and explained his actions. Detective Johnson was not present when Detective Boetcher took the fourth statement concerning the extraneous murder.

restroom, but he did not specify when.

The trial judge entered oral findings into the record and stated, inter alia,

[Appellant] was offered nothing in exchange for these three statements. There was no force, threats, or coercion made by the police. He was lucid. Did not appear intoxicated. Never asked for a–food or for anything to drink.
    The court finds that the statements are freely and voluntarily made and are admissible.

Appellant argues, without citation to any authority, that it is simply "ridiculous" to think that a person could give four voluntary statements if he had not had food, water, or use of the restroom for seven hours, even though he had never asked for those amenities.

The warnings required by *Miranda* were established to safeguard an uncounseled person's constitutional privilege against self-incrimination during custodial interrogation.[34] The warnings required by article 38.22 are virtually identical to the *Miranda* warnings and are required to be given only when there is custodial interrogation.[35] The determination of whether a statement stemming from custodial interrogation is voluntary is based upon an examination of the totality of the circumstances surrounding its acquisition.[36] Additionally, great deference is accorded to the trial judge's findings of facts concerning the voluntariness of a suspect's statement[37] and to her decision to admit or exclude such evidence, which will

_____

[34] *Herrera v. State,* 241 S.W.3d 520, 525 (Tex. Crim. App. 2007).

[35] *Id.* at 526.

[36] *Id.* at 525; *Penry v. State*, 903 S.W.2d 715, 744 (Tex. Crim. App. 1995).

[37] *See Green v. State,* 934 S.W.2d 92, 98-99 (Tex. Crim. App. 1996) (stating that, in the context of determining the voluntariness of a confession, the trial court is the sole fact finder and may elect to "believe or disbelieve any or all" of the evidence presented at a hearing on a motion

be overturned on appeal only where "a flagrant abuse of discretion is shown."[38]

Relevant factors to consider when determining whether a confession is coerced include, but are not limited to, whether the defendant received *Miranda* warnings; the defendant's age, intelligence level, education and mental state; the conditions under which the defendant was interrogated (i.e., duration, environment and access to restroom facilities and food); and whether the defendant was physically punished.[39] A custodial interview lasting seven or more hours is not, by itself, unconstitutionally coercive.[40] Nor is the fact that the suspect was not given food, drink, or use of the bathroom, absent a request to do so. In the present case, Detective Johnson testified that he did offer appellant food and drink, but appellant declined the offer. Detective Boetcher testified that appellant did use the bathroom

---

to suppress); *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995) (at a hearing on a motion to suppress a confession, "the trial court is the sole judge of the weight and credibility of the evidence").

[38] *Delao v. State*, 235 S.W.3d 235, 238-39 (Tex. Crim. App. 2007).

[39] *See Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973).

[40] *See, e.g., Clark v. Murphy*, 331 F.3d 1062, 1073 (9th Cir. 2003) (confession not coerced when evidence showed that defendant was detained in a small interview room for about eight hours and did not ask for food or water or ask to use bathroom facilities); *Jenner v. Smith*, 982 F.2d 329, 334 (8th Cir. 1993) ("The fact that the questioning extended for six or seven hours is not per se unconstitutionally coercive."); *Sumpter v. Nix,* 863 F.2d 563, 565 (8th Cir. 1988) ("The seven and one-half hour interrogation, Sumpter's IQ of 89, and the special agent's references to Sumpter's child and wife, even if considered in combination with one another, do not make the confession involuntary."); *cf. Stein v. New York,* 346 U.S. 156, 185-86 (1953) (twelve hours of intermittent questioning by different officers over a 32-hour period was not unconstitutionally coercive); *compare Greenwald v. Wisconsin,* 390 U.S. 519, 520-21 (1968) (confession involuntary when the suspect, while on medication, was interrogated for over eighteen hours without food, medication, or sleep, and was denied requested counsel).

at some time during the interview. There is no evidence that appellant made any request for food, drink, or use of the bathroom that was denied. Detective Johnson further testified that the rapport between the officers and appellant was "extremely friendly" and that appellant was fully cooperative. The appellant proffers no persuasive argument or authority that his confession was not voluntarily given, and our review of the record reveals no evidence showing that his statement was not voluntary. We conclude that the trial judge did not abuse her discretion in admitting appellant's custodial statements.[41] We therefore overrule appellant's seventh through tenth points of error.

**Appellant's Request for A Jury Instruction on Voluntariness**

In his eleventh point of error, appellant contends that the trial judge erred in refusing to include an instruction in the jury charge concerning the voluntariness of his three written statements concerning the charged capital offense and the fourth statement concerning the extraneous murder that was introduced at the punishment stage. The sum total of his argument under this point of error is as follows:

> In the case at bar, a hearing was conducted on the voluntariness of Appellant's four statements. As argued in his previous points of error, Appellant was subjected to seven hours of custodial interrogation with no food, water, or access to bathroom facilities. The evidence raised a voluntariness issue and the trial court abused its discretion by not submitting an Art. 38.23 issue to the jury. *See Oursbourn v. State*, 259 S.W.3d 159, 177-78 (Tex. Crim. App. 2008), *remanded for harm analysis and rev'd*, 288 S.W.3d 65 (Tex. App.–Houston [1ˢᵗ Dist.] 2009, no pet.).

> During the jury charge conference, appellant asked the trial judge to include a written

---

[41] *See Delao*, 235 S.W.3d at 238-39.

jury charge instruction under Article 38.23 concerning his custodial confessions. However, a defendant's right to the submission of an Article 38.23 jury instruction is limited to instances in which there are affirmatively disputed issues of fact that are material to the claim of a constitutional violation that would make the disputed evidence inadmissible.[42] To raise a disputed fact issue for purposes of an Article 38.23 instruction, there must be some *affirmative* evidence that puts the existence of that fact into question.[43] For example, if there had been some affirmative evidence in this case that appellant had requested food, drink, or the use of the bathroom but his request was denied, that would suffice to raise a disputed fact (although that disputed fact might not suffice, by itself, to render appellant's confession constitutionally involuntary).[44] In the present case, however, appellant points to no such

---

[42] *Madden v. State*, 242 S.W.3d 504, 509-10 (Tex. Crim. App. 2007); *Vasquez v. State*, 225 S.W.3d 541, 545 (Tex. Crim. App. 2007) ("If there is no factual issue of how evidence was obtained, there is only an issue of law, which is not for a jury to decide under article 38.23(a).").

[43] *See Oursbourn v. State*, 259 S.W.3d 159, 177 (Tex. Crim. App. 2008). In *Oursbourn*, which appellant relies on, we stated:
> A defendant must establish three foundation requirements to trigger an Article 38.23 instruction: (1) the evidence heard by the jury must raise an issue of fact; (2) the evidence on that fact must be affirmatively contested; and (3) the contested factual issue must be material to the lawfulness of the challenged conduct in obtaining the statement claimed to be involuntary. The defendant must offer evidence that, if credited, would create a reasonable doubt as to a specific factual matter essential to the voluntariness of the statement. This factual dispute can be raised only by affirmative evidence, not by mere cross-examination questions or argument.

*Id.* (footnotes omitted).

[44] *See Madden*, 242 S.W.3d at 510 ("[I]f other facts, not in dispute, are sufficient to support the lawfulness of the challenged conduct, then the disputed fact is not submitted to the jury because it is not material to the ultimate admissibility of the evidence."); *see also Perry v. State,* 158 S.W.3d 438, 446 (Tex. Crim. App. 2004) (defendant not entitled to any jury

affirmative evidence in the record. He did not point to any such evidence at trial either.

When the trial judge pointed out that Detective Johnson "admitted that there were–that

[appellant] hadn't had anything to eat or drink, but there was no testimony that it went from

that to being coercive in any way," appellant's counsel simply stated:

> I think what I'm arguing–what I'm asking you to consider is, inferentially, just on the face of that testimony, in–common day experience that somebody being interrogated for seven hours and they don't request food, drink or water–food, drink or bathroom facilities in front of you for 30 minutes are nervous, tense, and otherwise, and ask for water. It's obvious to me.

In other words, appellant's position, both at trial and on appeal appears to be that a person

who does not have food, drink or use of the bathroom for seven hours cannot, as a matter of

law, give a voluntary written statement. First, as discussed in his points of error six through

ten, this is not the law. Second, if this were the law, then appellant would not be entitled to

a jury instruction under Article 38.23, because he is relying upon an issue of law, not an issue

of disputed fact. And jury instructions are appropriate only when there is a disputed issue

of material fact.[45] Therefore, appellant was not entitled to any jury instruction, and his

eleventh point of error is without merit.

---

instruction under art. 38.23(a); evidence of his intoxication and injury "does not raise any constitutional voluntariness issues because this evidence does not involve any police coercion or other official over-reaching."); *Alvarado v. State,* 912 S.W.2d 199, 211 (Tex. Crim. App. 1995) (statement involuntary under federal due process "only if there was official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker").

[45] *Madden*, 242 S.W.3d at 510; *see also Oursbourn*, 259 S.W.3d at 177.

**Miscellaneous Issues**

In points of error twelve through fourteen, appellant raises various legal issues concerning the Texas death-penalty scheme and its implementation. We have repeatedly rejected these claims and appellant does not persuade us to overrule our prior cases.

In point of error twelve, appellant argues that the trial court erred in overruling his motion to declare Article 37.071 unconstitutional because Texas law permits a grand jury to indict a person for capital murder without first reviewing the evidence to support the punishment special issues. He relies on *United States v. Robinson*,[46] in which the Fifth Circuit held that a federal indictment charging a defendant with capital murder must allege the aggravating factors that render a defendant eligible for the death penalty in the indictment.[47] That case, however, dealt only with federal indictments in federal prosecutions. The federal constitutional right to indictment in a felony case does not apply to the states.[48] Furthermore, the indictment in this case did allege the aggravating factors that elevated this case from a murder charge under Section 19.02 of the Texas Penal Code to capital murder–a murder that is eligible for imposition of the death penalty–under Section 19.03(a)(7)(A). Any capital-murder charge under Section 19.03 makes a defendant eligible for the death

---

[46] 367 F.3d 278 (5th Cir. 2004).

[47] *Id.* at 284.

[48] *See Albright v. Oliver,* 510 U.S. 266, 272 (1994) (the right to a grand-jury indictment has not been extended to the States through the Fourteenth Amendment).

penalty under Article 37.071 if the State seeks the death penalty in the particular case. The elements of capital murder alleged under Section 19.03 suffice to put the defendant on notice that the State may seek the death penalty. No further pleading within the indictment is necessary.[49]

In his thirteenth point of error, appellant argues that the trial court erred in overruling appellant's objection to the so-called "10-12" rule in the Texas death penalty scheme. We have repeatedly considered and rejected this claim.[50]

In his fourteenth point of error, appellant asserts that the trial judge erred in overruling his motion to instruct the jury that the State bears the burden of proof concerning the lack of mitigating evidence. We have repeatedly rejected this argument.[51]

Having reviewed all of appellant's fourteen claims, we find that none of them require reversal of the jury's verdict, and we therefore affirm the trial court's judgment and sentence.

Delivered: January 26, 2011
Do Not Publish

---

[49] *See Renteria v. State*, 206 S.W.3d 689, 709 (Tex. Crim. App. 2006); *see also Crutsinger v. State,* 206 S.W.3d 607, 613 (Tex. Crim. App. 2006); *Perry v. State,* 158 S.W.3d 438, 446-48 (Tex. Crim. App. 2004); *Hankins v. State,* 132 S.W.3d 380, 387 (Tex. Crim. App. 2004); *Resendiz v. State,* 112 S.W.3d 541, 550 (Tex. Crim. App. 2003).

[50] *See Coble v. State*, ___ S.W.3d __, No. AP-76,019, 2010 WL 3984713 at *23 (Tex. Crim. App. Oct. 13, 2010); *Williams v. State*, 301 S.W.3d 675, 694 (Tex. Crim. App. 2009); *Smith v. State*, 297 S.W.3d 260, 278 (Tex. Crim. App. 2009); *Segundo v. State*, 270 S.W.3d 79, 102-03 (Tex. Crim. App. 2008); *Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005).

[51] *See, e.g., Mays v. State*, 318 S.W.3d 368, 397 (Tex. Crim. App. 2010) ("This Court has consistently held that, under Texas statute, the State does not bear any burden of proof in the mitigation issue and that the statute setting out that issue and instructions is constitutional."), *citing Whitaker v. State*, 286 S.W.3d 355, 370 (Tex. Crim. App. 2009); *Busby v. State,* 253 S.W.3d 661, 667 (Tex. Crim. App. 2008).